In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 21-2009

JAMES BURKHART,

*Petitioner-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee*.

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:18-cv-04013 — **Tanya Walton Pratt**, *Chief Judge*.

_____

ARGUED JANUARY 6, 2022 — DECIDED MARCH 7, 2022

_____

Before SYKES, *Chief Judge*, and ROVNER and SCUDDER, *Circuit Judges*.

SCUDDER, *Circuit Judge*. James Burkhart was the CEO of American Senior Communities, LLC, a private company that manages and operates nursing homes and long-term care facilities in Indiana. Burkhart orchestrated an extensive conspiracy exploiting the company's operations and business relationships for personal gain. He ultimately pled guilty to fraud and money laundering charges and received a below-

Guidelines sentence. He later brought this habeas action, contending that his defense counsel, Barnes & Thornburg LLP, provided constitutionally deficient representation because the firm also represented Health and Hospital Corporation of Marion County, one of the victims of the fraudulent scheme. Everyone agrees that Barnes & Thornburg labored under an actual conflict of interest. But the district court was right to conclude that this conflict did not adversely affect Burkhart's representation, so we affirm.

## I

### A

Health and Hospital Corporation ("HHC") is a municipal corporation that serves as the certified operator of nursing homes and long-term care facilities in Indiana. HHC contracted with American Senior Communities ("ASC") to manage these facilities. In this role, ASC had autonomy in selecting, contracting with, and paying vendors to run the nursing facilities. As part of this arrangement, ASC used HHC funds to manage the facilities, including by writing checks and making payments that drew directly on HHC's bank accounts. Medicare and Medicaid supplied the vast majority of the funds HHC used to pay ASC expenses.

For nearly six years, from 2009 to 2015, Burkhart, the then-CEO of ASC, and others abused the company's operations for their own personal gain. They orchestrated a scheme to funnel money to themselves by causing ASC's vendors (or Burkhart-controlled entities purporting to be vendors) to inflate their invoices and kick back the inflated profits or by requiring vendors to pay kickbacks to do business with ASC. This scheme inflicted financial losses on Indiana's Medicaid

program, ASC, and HHC. In time, law enforcement detected the wrongdoing and commenced a criminal investigation.

On September 15, 2015, federal agents executed a search warrant at Burkhart's home in Carmel, Indiana. While the search was underway, Burkhart called lawyers at Faegre Baker Daniels LLP. In discussing the situation, the Faegre lawyers told Burkhart that the firm was unable to represent him because of a conflict with HHC. The Faegre attorneys then referred Burkhart to Larry Mackey, an accomplished trial lawyer at Barnes & Thornburg in Indianapolis.

Burkhart signed an engagement letter with Barnes & Thornburg on September 21, 2015. The letter never mentioned that HHC was a client of the firm.

Upon being retained, Barnes & Thornburg turned to investigating and evaluating Burkhart's potential criminal exposure. Larry Mackey and his team worked with Burkhart to identify potential witnesses; reviewed each transaction with any entity financially related to Burkhart, his family members, or his friends that involved HHC or ASC; and hired experts and consultants to review whether those transactions occurred on terms and conditions reflecting fair market value. Barnes & Thornburg also worked to dissuade the government from filing charges. But these efforts ultimately proved unsuccessful.

In October 2016 a grand jury returned a 32-count indictment against Burkhart and three others for their role in the alleged scheme to defraud HHC, ASC, and Indiana Medicaid. Burkhart's co-defendants included ASC's Chief Operating Officer Daniel Benson, long-time Burkhart business associate Steven Ganote, and Burkhart's younger brother, Joshua

Burkhart, whom Burkhart brought into several inflated-invoice schemes.

In the wake of the indictment, Barnes & Thornburg turned to mounting a trial defense. The firm explored at least 21 arguments, focusing chiefly on finding a way to negate the intent element of the charged offenses. The firm reviewed the government's discovery production; interviewed potential witnesses; engaged three expert witnesses; prepared to call many other defense witnesses, including Burkhart; assembled approximately 1,100 trial exhibits; drafted cross-examination outlines of anticipated government witnesses; researched and prepared jury instructions; and even drafted a version of an opening statement. Barnes & Thornburg also conducted three mock jury exercises, all of which resulted in unanimous votes to convict Burkhart. Suffice it to say Barnes & Thornburg had an uphill defense on their hands.

B

A major development occurred in November 2017, two months before the scheduled start of trial. It was then that Burkhart's co-defendant and younger brother, Joshua, pled guilty and agreed to cooperate with the government. Barnes & Thornburg recognized the significance of this event— Burkhart's own brother would take the witness stand and testify in open court against him. This development caused Larry Mackey to explore the possibility of resolving the case with the government. When those efforts failed to pan out, the final push of trial preparations began. Trial remained scheduled for January 2018.

The situation worsened for Burkhart three weeks later when two other defendants, Daniel Benson and Steven

Ganote, also pleaded guilty and agreed to cooperate with the government. At that point, Mackey saw the writing on the wall. He emailed Burkhart and advised that it was "[t]ime for considering [a] new grand plan strategy" because Benson's anticipated testimony would be "very damaging to him and to you." Plea negotiations then began in earnest.

Barnes & Thornburg spent a week negotiating with the government over Sentencing Guidelines stipulations, forfeiture and restitution, and the factual basis for Burkhart's guilty plea. These negotiations culminated in Burkhart and the government reaching an agreement on the terms and conditions of a plea.

Burkhart pled guilty on January 10, 2018. He pled to three counts—(1) conspiracy to commit mail, wire, and healthcare fraud (18 U.S.C. § 1349); (2) conspiracy to violate the Anti-Kickback Statute (18 U.S.C. § 371); and (3) money laundering (18 U.S.C. § 1956(a)(1)(B)(i))—and the government agreed to dismiss the remaining 17 counts. The district court calculated Burkhart's advisory Guidelines range to be 121–151 months' imprisonment and sentenced him to 114 months, crediting the remorse Burkhart showed at sentencing.

It was after sentencing that Barnes & Thornburg's conflict of interest entered the picture and triggered these proceedings.

C

Dating to at least 2003, Barnes & Thornburg represented HHC in many matters, ranging from lobbying engagements to white collar investigations and civil litigation. By way of example, Mackey and other core members of Burkhart's defense team had defended a False Claims Act case involving

allegations that HHC and Matthew Gutwein, its CEO, made misrepresentations to the federal government to increase its payouts under a particular program. After agreeing to represent Burkhart, Barnes & Thornburg took on a new representation of HHC in a whistleblower retaliation suit where an employee alleged that she was discharged for reporting that HHC submitted false bills.

Burkhart knew none of this throughout his criminal case—not at the outset and not along the way as Barnes & Thornburg continued to represent him. He learned of the conflict after being sentenced based on his diligence through online research. Understandably troubled, Burkhart turned to pursuing post-conviction relief.

D

In December 2018 Burkhart invoked 28 U.S.C. § 2255 and alleged that Barnes & Thornburg's conflict of interest violated his Sixth Amendment right to effective counsel. He requested an evidentiary hearing. Extensive discovery then ensued—no doubt because Burkhart waived his attorney-client privilege with Barnes & Thornburg.

The district court did not hesitate to find that Barnes & Thornburg operated under an actual conflict of interest. But the district court did have trouble seeing any adverse effect on Burkhart's representation that rendered the firm's performance constitutionally deficient. Rather, the deficiencies claimed by Burkhart were inconsistent with the record. Indeed, the district court found that Barnes & Thornburg acted diligently and carefully in defending Burkhart. In particular, "the record conclusively reflect[ed]" that the firm "thoroughly prepared a *mens rea* defense on Burkhart's behalf" by

planning to contend that Burkhart did not intend to defraud anybody.

Similarly, the district court rejected Burkhart's contention that Barnes & Thornburg pulled punches in its planned cross-examination of Matthew Gutwein, HHC's CEO. The district court reasoned that attempting to implicate Gutwein in a potentially fraudulent scheme involving inflated invoices that would have benefited Burkhart was "not a plausible alternative" "because Burkhart himself participated in the arrangement and stood to receive $4.1 million as a result." Further, the evidence would serve to undercut Gutwein's credibility, which in turn "could have undermined Burkhart's strategy to elicit testimony about his *mens rea* defense through Gutwein." The district court also recognized that Barnes & Thornburg stood ready to impeach Gutwein with prior inconsistent statements if his testimony at trial diverged from his prior statements made to the FBI.

The district court further found that Barnes & Thornburg did not shade its advice to Burkhart to induce him to plead guilty. Rather, "the record conclusively reflects that B&T's advice to Burkhart to plead guilty was based on the evidence against him, including the very damaging recorded conversations and potential testimony of his co-defendants who had already pled guilty." The district court highlighted how the "final plea agreement included not only concessions from the Government in the Factual Basis, . . . but it also gave Burkhart the ability to argue at sentencing for a lower Guidelines range" because of "a significantly lower loss amount (and restitution amount) than the Government was contending." All of this, the district court added, helped Burkhart while also potentially causing HHC to collect less in restitution.

In the end, then, the district court denied Burkhart's § 2255 motion and accompanying request for an evidentiary hearing.

## II

Our review proceeds along two tracks. We take our own independent look at the district court's legal conclusions and will reverse the factual findings only if they reflect clear error. See *United States v. Coscia*, 4 F.4th 454, 474 (7th Cir. 2021).

## A

The Sixth Amendment guarantees criminal defendants not only the right to the effective assistance of counsel, but also the "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). The Supreme Court's 1980 decision in *Cuyler v. Sullivan*, 446 U.S. 335, supplies the framework governing Burkhart's claim.

*First*, Burkhart "must demonstrate . . . an actual conflict of interest." *Id.* at 348. Nobody disputes that Barnes & Thornburg was conflicted in its representation of Burkhart. The question is not close.

*Second*, Burkhart must further establish that the conflict "adversely affected his lawyer's performance." *Id.* "An adverse effect can be demonstrated by showing that but for the attorney's actual conflict of interest, there is a reasonable likelihood that counsel's performance somehow would have been different." *Coscia*, 4 F.4th at 475 (cleaned up). Put another way, "[t]he defendant must show 'specific instances where [his] attorney could have, and would have, done something different.'" *United States v. Grayson Enters., Inc.*, 950 F.3d 386, 398 (7th Cir. 2020) (quoting *Griffin v. McVicar*, 84 F.3d 880, 887 (7th Cir. 1996)). This something different must be a "plausible alternative to the strategy actually pursued at trial," though it

need not be a "winning" strategy. *Id.* at 399. Although not as difficult to meet as the standard for prejudice for typical ineffective assistance of counsel claims, demonstrating an adverse effect "is nevertheless a significant burden." *Coscia*, 4 F.4th at 475.

Burkhart begs to differ with this second requirement. He invites us to conclude that the necessity of showing a plausible alternative strategy applies only where, unlike here, a lawyer represents two criminal defendants in the same trial. We decline to do so. There can be no "reasonable likelihood" that counsel would have done something different, *id.*, if the alternative defense strategy was implausible. Similarly, the requirement that a defendant show specific instances where counsel both could have and would have pursued an alternative strategy, *Grayson Enters.*, 950 F.3d at 398, has an implicit plausibility requirement: the law does not require defense counsel to pursue hypothetical strategies with no on-the-ground plausibility in the realities of the prosecution facing a defendant.

Because Burkhart resolved his case by plea, our inquiry takes on an added level of refinement. To show an adverse effect on the plea decision, "a petitioner who pleaded guilty upon the advice of an attorney with a conflict of interest is not required to demonstrate that he would have decided against pleading guilty had he been represented by a conflict-free attorney." *Hall v. United States*, 371 F.3d 969, 974 (7th Cir. 2004). Likewise, a petitioner does not "need to establish that a conflict-free attorney would have advised against pleading guilty." *Id.* The proper focus is instead "on whether the defense counsel's conflict affected his actions and the defendant's decision to plead guilty, not whether another attorney

without conflict would have made the same recommendation." *Id.* (citing *Thomas v. Foltz,* 818 F.2d 476, 483 (6th Cir. 1987)).

## B

The district court applied this exact framework and took great care in considering whether Barnes & Thornburg's conflict adversely affected the firm's representation of Burkhart. At every turn, we agree with the district court's rejection of Burkhart's contentions.

## 1

The district court was right to conclude that nothing in the record shows that Barnes & Thornburg improperly shaded its advice to induce Burkhart to plead guilty. To the contrary, the advice reflected a reasonable response to the dire circumstances facing Burkhart.

Perhaps above all else, Barnes & Thornburg clearly saw the insurmountable hurdle Burkhart faced in the prosecution—the strength of the government's case. To our eyes, too, the evidence of Burkhart's guilt was overwhelming, including:

- secret recordings capturing Burkhart discussing the fraudulent scheme with vendors;

- testimony from third-party vendors who had been asked by Burkhart and his co-conspirators to inflate invoices;

- records from search warrants documenting the fraudulent misconduct, including the inflated invoices themselves;

- emails among and between Burkhart and his co-conspirators discussing the scheme; and

- financial records showing the flow of money from vendors to shell companies for personal purchases by Burkhart and others.

This evidence was so damaging that three mock juries voted unanimously to convict Burkhart. In reaching these conclusions, the mock jurors expressed little sympathy toward Burkhart, reacting instead with "anger" and "disgust" at his conduct and describing him as "manipulative," "greedy," "sneaky," a "crook," and a "thief."

But there was more. Remember what happened two months before trial. Burkhart's chances of beating the government's case grew especially bleak when ASC Chief Operating Officer Daniel Benson, long-time business associate Steven Ganote, and Burkhart's younger brother pled guilty and agreed to testify as government witnesses. Mackey—a lawyer with extensive trial experience—did not miss the significance of this development. Upon seeing these additional guilty pleas with accompanying cooperation agreements, Burkhart's legal team recognized that it was "[t]ime for considering [a] new grand plan strategy." It was then that they advised Burkhart to plead guilty.

Burkhart wants to sidestep this conclusion by redirecting our attention away from the strength of the government's evidence to lesser points. He contends that Barnes & Thornburg improperly shaded and compromised its advice to secure additional restitution for HHC and avoid exposing the company's potential misconduct. The district court read the record differently. We do too.

If Burkhart is right that Barnes & Thornburg's conflict created this incentive, he misses the mark when urging the conclusion that the firm then acted in concrete ways that harmed his defense. In no uncertain terms, the record shows that Barnes & Thornburg undertook nearly two and a half years of work on Burkhart's behalf, which included moving to dismiss charges, hiring multiple experts, exploring multiple defenses, developing trial exhibits, issuing trial subpoenas, and conducting three mock jury exercises. The firm also positioned itself to present HHC's alleged misconduct to the jury. And Barnes & Thornburg was still working diligently on Burkhart's defense two weeks before he signed the plea agreement. On this record, the district court did not clearly err in concluding that Barnes & Thornburg would not have undertaken such extensive trial preparations if its plan all along was to coax an eleventh-hour plea.

The same diligence manifested itself in the plea negotiations. Barnes & Thornburg took care to ensure that Burkhart would be able to argue for a lower Guidelines range on the basis that the government overstated HHC's losses. This argument, if successful, would have resulted in HHC receiving less in restitution.

Barnes & Thornburg's efforts yielded tangible benefits for Burkhart. By pleading guilty, he was able to receive acceptance of responsibility credit and, in turn, a lower advisory Guidelines range. He also was able to present himself in a more favorable light at sentencing by emphasizing his remorse and underscoring his good works in the community. The district court committed no error in rejecting the contention that Barnes & Thornburg's conflict of interest—and not the overall strength of the government's case and the

weakness of possible defenses—is what came to shape the firm's advice that Burkhart avoid trial.

2

Nor do we see error in the district court's conclusion that attempting to impeach Matthew Gutwein, HHC's CEO, by implicating HHC in another potentially fraudulent scheme that would have benefited Burkhart was not a plausible alternative strategy.

This point requires some unpacking. Burkhart explains that this other scheme proceeded as follows: HHC entered into lease agreements with an entity named Formation Capital for additional properties from which it could run nursing homes. As part of negotiating these leases, HHC sought a put agreement, which would allow it to assign its rights and obligations under the leases to a third-party company owned by Burkhart. HHC then allegedly paid extra "rent" to Formation Capital, which would, in turn, enter into a "Consulting Agreement" with Burkhart and pass this "rent" to him as additional compensation for serving as party to whom the leases would be put.

The district court was right to see this Formation Capital ordeal as an implausible defense strategy. *First*, putting this evidence before the jury would have directly implicated Burkhart in other transactions the jury could have seen as fraudulent. Raising this matter would have painted Burkhart in a worse light before the jury and ran the risk of new criminal charges befalling him. Barnes & Thornburg and Burkhart both saw this risk, with the firm explaining that the "defense team had been concerned pre-indictment and discussed with Mr. Burkhart that the government might charge Mr. Burkhart

with one or more criminal offenses related to the put transaction. Having avoided indictment on this issue, it was contrary to Mr. Burkhart's interests to suggest the government should reconsider that decision." Right to it, Barnes & Thornburg chose not to risk Burkhart throwing a boomerang at trial.

*Second*, this potential deployment of the Formation Capital transaction was at odds with Burkhart's intended defense at trial. The Formation Capital arrangement—because of the way the put would have ultimately operated—effectively rendered Burkhart a contingent owner of the nursing homes. Burkhart planned to use the fact of him having financial skin in the game with the nursing homes to argue that he would not have taken steps to defraud those same nursing homes. This reasoning and line of argument factored prominently in Burkhart's defense, including Barnes & Thornburg's draft opening statement.

*Third*, the district court likewise recognized that attempting to impeach HHC CEO Gutwein with the Formation Capital transaction under Federal Rule of Evidence 608(b) (assuming it was otherwise admissible) was not a plausible strategy. Doing so would have undermined Burkhart's planned trial defense. All along Burkhart had described Gutwein as "the key witness" to presenting his *mens rea* defense. Implicating Gutwein in a potentially fraudulent scheme would have hurt—not helped—his credibility as a witness, thereby undercutting Burkhart's defense. There was no clear error in the district court seeing the circumstances this exact way.

### 3

The record likewise reflects that the district court did not clearly err in finding that Barnes & Thornburg was prepared to present a *mens rea* defense. Burkhart's trial plan was to show that he lacked the intent to defraud HHC because its owners, the Jackson family, also held undisclosed financial interests in its vendors. Because this practice allegedly permeated the industry, Burkhart intended to argue at trial that he believed he was acting lawfully in not disclosing his ownership interests and that HHC was not actually victimized by the scheme. Burkhart would have presented this defense primarily through the testimony of Gutwein, who previously told the FBI that the Jacksons had not disclosed their financial interest in HHC vendors.

This contention is belied by the record. Indeed, Burkhart himself admitted in his deposition that "I believe B&T was attempting to prepare a *mens rea* defense." This belief is well founded because there exist several references to a *mens rea* defense in Barnes & Thornburg's draft opening statement as it existed ten days before the guilty plea; the cross-examination outlines for Frank Jackson, one of HHC's owners, and Gutwein; the mock jury exercises; and Burkhart's draft direct-examination outline that he himself edited. Given the totality of this evidence, it cannot be said that the *mens rea* defense went unattended to. Instead, it would have likely been the focus of a trial had Burkhart not pled guilty.

### 4

Finally, the district court did not clearly err in concluding that Barnes & Thornburg prepared itself to vigorously cross-examine Gutwein. The firm's draft cross-examination outline

included a series of questions about the Jackson family's ownership interest in vendors that cited as support Gutwein's prior statements to the FBI. The firm was therefore prepared itself to impeach Gutwein with these prior statements were he to testify inconsistently at trial.

Far from Burkhart's suggestion that Barnes & Thornburg planned to pull punches during the cross-examination, the firm prepared searching and probing questioning of Gutwein. If anything, the planned examination was overly aggressive, as it included questions designed to expose personal and embarrassing misconduct by Gutwein.

Bringing this all together, we see no clear error in any of the district court's factual findings. Although there existed an actual conflict, it did not result in any adverse effect on Burkhart's representation.

## III

We close by addressing the district court's denial of an evidentiary hearing. We see no abuse of discretion here. See *Coscia*, 4 F.4th at 481–82 (citing *Kafo v. United States*, 467 F.3d 1063, 1067 (7th Cir. 2006)).

A district court has the discretion to deny a habeas petitioner an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," 28 U.S.C. § 2255(b), or "if the petitioner makes conclusory or speculative allegations rather than specific factual allegations." *Coscia*, 4 F.4th at 482 (quoting *Daniels v. United States*, 54 F.3d 290, 293 (7th Cir. 1995)).

These criteria are both satisfied here. The parties undertook extensive discovery, which included both Burkhart and Barnes & Thornburg producing massive volumes of

documents, lengthy interrogatory responses, and Burkhart being deposed. This discovery provided the district court with a sufficient basis to make informed findings on Burkhart's motion because it showed that Burkhart lacked evidence that Barnes & Thornburg's conflict had an adverse effect on his representation.

Burkhart's supposition that the testimony of his former attorneys, including Larry Mackey, may have bolstered his argument is not enough to require a hearing. See *id.*; see also *Aleman v. United States*, 878 F.2d 1009, 1013 (7th Cir. 1989) (concluding that there was no need for an evidentiary hearing when the petitioner "offer[ed] conjecture, not facts" that certain witnesses were informants). This is especially so because Burkhart took no steps to depose his former attorneys, despite having the ability to do so, and the contemporaneous evidence aligns with Barnes & Thornburg's interrogatory responses.

*         *         *

In denying Burkhart's petition, the district court took considerable care with the robust factual record assembled by the parties. And, in the end, the district court leaned into its diligence to conclude both that an evidentiary hearing was unnecessary and that Burkhart's claim failed on the merits. We AFFIRM.