In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 23-1148

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT MASON ELLIOTT,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cr-00152 — **Tanya Walton Pratt**, *Chief Judge.*

_____

ARGUED MAY 16, 2024 — DECIDED AUGUST 5, 2024

_____

Before EASTERBROOK, RIPPLE, and JACKSON-AKIWUMI, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Faced with more than a dozen federal charges relating to his possession of firearms, sexual exploitation of a minor, and plot to murder that minor and her mother, Robert Mason Elliott retained Attorney Brandon Sample to represent him. More than a year into his representation of Mr. Elliott, Sample filed a motion to withdraw. He had discovered a controlled substance concealed in

documents that he had been asked to deliver to Mr. Elliott. Sample informed the court of the discovery, but neither he nor the court told Mr. Elliott. Unaware of why Sample sought to withdraw, Mr. Elliott objected to his attorney's motion. Emphasizing Mr. Elliott's right to counsel of his choice, the district court denied Sample's motion. Ten months later, Mr. Elliott, still represented by Sample, reached a plea agreement with the Government and pleaded guilty to five counts.

Mr. Elliott now appeals his conviction. He contends that Sample had an actual conflict of interest, that the district court violated his Sixth Amendment right to conflict-free counsel by failing to inform him of this conflict, and that because his counsel was conflicted, his guilty plea was not knowing and voluntary. The Government submits that Mr. Elliott's appeal is entirely foreclosed by the appellate waiver within his plea agreement.

We hold that Mr. Elliott's Sixth Amendment claim is not foreclosed by the appellate waiver. We further conclude that even if Sample were conflicted, Mr. Elliott cannot establish that he was adversely affected by the alleged conflict of interest. Accordingly, we affirm the judgment of the district court.

# I

## BACKGROUND

In 2017, Mr. Elliott, then 23 years old, began a sexual relationship with a 16-year-old girl ("Minor Victim 1"). In August 2017, after Mr. Elliott was charged in Indiana state court with battering Minor Victim 1, the court entered a no-contact order barring Mr. Elliott from further communicating with her. Two months later, Minor Victim 1's mother ("Witness Victim 1") reported to law enforcement that Mr. Elliott had violated

the order. Mr. Elliott had used Facebook Messenger to send Minor Victim 1 a video directing her to the location of a compact disc case containing heroin. Local law enforcement obtained a search warrant for Mr. Elliott's Facebook Messenger account. In the subsequent search, they found five videos sent by Mr. Elliott to Minor Victim 1 depicting them engaging in sexual activity. Mr. Elliott also had shared a video of himself and Minor Victim 1 engaging in sexual activity on Snapchat; Witness Victim 1 provided a screenshot of this Snapchat video to law enforcement. Mr. Elliott was subsequently charged in Indiana state court with additional offenses including dealing a narcotic drug to a minor, invasion of privacy, child exploitation, and possession of child pornography.

In December 2018, the Government filed a criminal complaint against Mr. Elliott in the United States District Court for the Southern District of Indiana. Mr. Elliott retained private counsel. A few months later, a federal grand jury indicted Mr. Elliott. This indictment charged him with eleven counts relating to the sexual exploitation of Minor Victim 1 and one count of being a felon in possession of a firearm.

While in custody awaiting trial on these charges, Mr. Elliott attempted to arrange for the murders of Minor Victim 1 and Witness Victim 1. He told a fellow inmate about a cache of weapons stolen from the military and buried in the backyard of the house where he had lived with his mother and grandfather before his arrest. Mr. Elliott asked if the inmate knew someone who would kill Minor Victim 1, Witness Victim 1, and Minor Victim 1's sister in exchange for the weapons. The inmate contacted his attorney about Mr. Elliott's request; the attorney contacted law enforcement. The inmate

agreed to assist law enforcement by providing Mr. Elliott with the phone number of an undercover FBI agent posing as a drug cartel hitman named "Arturo."

Mr. Elliott mailed a letter to the inmate's wife, which he intended that she pass to Arturo. In this letter, Mr. Elliott identified Minor Victim 1 and Witness Victim 1 by name and provided other information about them, including their Facebook accounts. Using coded language about delivering a motorcycle, he offered to give Arturo a motorcycle and the stolen military weapons in exchange for their murders. He wrote: "They are witnesses for the state and the Feds on someone I know. They are trying to put him away for life. So when you deliver the motorcycle to them and take care of them be careful."[1] The inmate's wife provided the letter to law enforcement. Mr. Elliott was transferred to a new facility before the inmate could give him Arturo's phone number. Mr. Elliott asked the inmate to provide Arturo's phone number to Mr. Elliott's grandfather.

A few days later, the inmate called Mr. Elliott's grandfather and provided him with Arturo's phone number. Mr. Elliott's grandfather then passed this number to Mr. Elliott. Initially unsuccessful in his attempt to speak to Arturo, Mr. Elliott called his grandfather and asked that he send a text to Arturo so the hitman would know to expect his call. That same day, Arturo received a text message about Mr. Elliott's impending call from a number belonging to Mr. Elliott's mother. Mr. Elliott called Arturo again, and this time Arturo answered. During this call, Mr. Elliott confirmed that Arturo had received the letter. Mr. Elliott told Arturo that it

---

[1] R.252 ¶ 37.

contained everything that he needed to know. Employing the same coded language used in the letter, Mr. Elliott asked Arturo to kill Minor Victim 1 and Witness Victim 1 in exchange for the motorcycle and weapons.

After this call, federal agents executed a search warrant of the Elliott home. There, law enforcement found notes pertaining to Mr. Elliott's conversations with his grandfather about Arturo and two firearms belonging to Mr. Elliott. Following this search, the grand jury returned a superseding indictment adding charges relating to the murder for hire scheme.

A second superseding indictment, returned in October 2019, charged Mr. Elliott with seventeen counts: two counts of murder for hire, in violation of 18 U.S.C. § 1958(a); one count of conspiracy to commit murder for hire, in violation of 18 U.S.C. § 1958(a); two counts of tampering with a witness, victim, or informant, in violation of 18 U.S.C. §§ 1512(a)(1) and (2); five counts of sexual exploitation of a child, in violation of 18 U.S.C. § 2251(a); one count of coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b); five counts of distribution of child pornography, in violation of 18 U.S.C. § 2522(a)(2); and one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Mr. Elliott underwent a mental health examination after the district court granted his motion to determine mental competency. The examining psychologist diagnosed Mr. Elliott with borderline personality disorder and other psychological conditions but concluded that none of these disorders prevented him from understanding the legal proceedings and properly assisting his counsel. After reviewing the

psychologist's report and conducting a competency hearing, the district court found Mr. Elliott competent to stand trial.

In May 2020, Mr. Elliott's first retained counsel withdrew, and Brandon Sample entered his appearance as Mr. Elliott's retained counsel. In August 2021, more than a year into Sample's representation of Mr. Elliott and two months before the date then set for trial, Sample filed a motion to withdraw, citing "professional considerations."[2] After the district court set the motion for a hearing, Sample filed a memorandum asking that any further discussion of the motion occur in camera. In a footnote, Sample added, without further elaboration, that he was concerned for his safety and the safety of others.

The district court promptly held two hearings on Sample's motion. It conducted the first hearing with only Sample in attendance. At this hearing, Sample told the court that Mr. Elliott had made use of Sample's representation to commit a felony. Sample proceeded to explain to the court the specific circumstances:

> MR. SAMPLE: Just, very generally, I was asked to bring some legal documents to him at the jail. I met a person to do that. I became suspicious about the nature of what was in those documents. I arrived to the jail. I did not take them into the facility. I locked them up. I went up to go and see my client, and there was an emergency in the jail, and so I ended up not seeing him at all. I left the jail. I inspected the legal pad with more particularity, and I discovered what

---

[2] R.129.

appeared to be 21 strips of Suboxone.[3] I, subsequent to that, spoke with my fiancee, who works with me as an assistant, as well. She had been reviewing discovery with him. She indicated to me that in one of the last meetings, that he had asked her to smuggle drugs into the jail. He explained how he was doing it. He -- and she indicated to me that she didn't tell me about that at the time because she was concerned that I would feel that I had to withdraw. And I believe, with him having done something like this, that there's no way that I could continue to represent him. I am acutely aware of my professional responsibilities, and I can take a lot of nonsense, but something like this, it goes beyond the pale.

THE COURT: So you did -- but you have not done anything unethical or illegal; am I correct?

MR. SAMPLE: Not to my knowledge, Your Honor.

THE COURT: Because you caught it in time?

MR. SAMPLE: Yes, although, arguably, this is some kind of attempt. But, I mean, I just don't -- needless to say, I was quite flustered. I spoke with my bar counsel about this, and I -- who encouraged me to even retain my own counsel to discuss the matter. I spoke with two lawyers in

---

[3] The primary drug component in Suboxone is Buprenorphine, a Schedule III controlled substance. *Dollard v. Whisenand*, 946 F.3d 342, 348 (7th Cir. 2019); 21 C.F.R. § 1308.13(e)(2)(i).

Indianapolis about this situation, both of whom advised me that I needed to make a motion to withdraw from the case, that there was no way, professionally, that I could continue to represent him under these types of circumstances.[4]

The district court then ordered that Mr. Elliott be brought into the courtroom for an ex parte hearing. Neither the court nor Sample informed Mr. Elliott about Sample's discovery of the Suboxone strips. Sample told the court that he had not discussed the discovery with Mr. Elliott. In informing Mr. Elliott of his intent to withdraw, Sample had written only that there was an "irreconcilable conflict" without elaborating on the nature of that conflict.[5]

At the hearing, Mr. Elliott objected to Sample's motion to withdraw. He explained that he wanted Sample to continue as his attorney because Sample understood his case and his mental health condition and because they were making "good headway."[6] Mr. Elliott also told the court that his family had mortgaged their house to pay Sample's $250,000 fee and had already paid Sample most of that amount. Mr. Elliott believed he and his family could not afford to retain another attorney. Mr. Elliott confirmed to the court that he understood that his lawyer could not do anything unethical or illegal on his behalf and agreed to not request that Sample engage in such activity.

After Mr. Elliott expressed his desire to continue with Sample as his attorney, Sample reiterated his belief that he

---

[4] R.291 at 7–8.

[5] R.289 at 3.

[6] *Id.*

could not continue to represent Mr. Elliott. Sample also told the court that he had already received half of his $250,000 fee to represent Mr. Elliott and that this $125,000 would not be refunded if he withdrew.[7]

Concluding the ex parte hearing by taking Sample's motion under advisement, the court then convened a full hearing to discuss the state of plea negotiations. The Government had offered Mr. Elliott an agreement under which he would plead guilty to eight counts (two counts of murder for hire, two counts of witness tampering, two counts of sexual exploitation of a child, one count of coercion and enticement of a minor, and one count of being a felon in possession of a firearm) and receive a sentence of between 15 and 55 years' imprisonment. Mr. Elliott rejected this offer. He told the court that Sample had advised him that he would "be crazy to take" such a deal.[8]

The district court then denied Sample's motion to withdraw. The order first discussed the Indiana Rules of Professional Conduct. Rules 1.16(b)(2) and (3), the court explained, state that an attorney *may* withdraw if the client persists in the criminal course of action involving the lawyer's services or has used the attorney's service to perpetuate a crime. The court determined that these provisions were not implicated because "Sample agreed that a crime had not been

_____

[7] In addition to Mr. Elliott's and Sample's statements, the court also considered a letter from Mr. Elliott's mother asking that the motion be denied. She stated that she had contacted many other lawyers who were unwilling to take on Mr. Elliott's case; that Sample was the only attorney who understood Mr. Elliott's mental health problems; and that she was now attempting to sell her home to pay the remaining portion of Sample's fee.

[8] R.156 at 5.

perpetuated" and "Elliott understood and agreed that he could not use Sample's services to carry out unethical or illegal conduct."[9] Next, the court noted that Mr. Elliott's behavior was consistent with the personality disorders from which he suffers, and that Sample was an experienced attorney who had been aware of Mr. Elliott's mental illness when he agreed to represent him. Finally, "[a]nd most importantly," the court emphasized Mr. Elliott's desire to be represented by Sample.[10] Considering the presumption in favor of a defendant's choice of counsel, the court concluded that there was no irreconcilable conflict between Mr. Elliott and Sample precluding an adequate defense.

Sample continued to represent Mr. Elliott through his plea negotiations and sentencing. Two days after the denial of the motion to withdraw, Mr. Elliott filed a second motion to determine his mental competency. The court granted this motion and Mr. Elliott underwent another psychological evaluation. In May 2022, after a second competency hearing, the court again found Mr. Elliott competent to stand trial.

In June 2022, Mr. Elliott reached a plea agreement with the Government. He agreed to plead guilty to two counts of murder for hire; two counts of witness tampering; and one count of being a felon in possession of a firearm and ammunition.[11] This agreement provided that the remaining counts would be dismissed, and Mr. Elliott would be sentenced to a term of

---

[9] R.134 at 5.

[10] *Id.* at 6.

[11] Before the second competency hearing, the court, on the Government's motion, dismissed two counts: conspiracy to commit murder for hire, and coercion and enticement of a minor.

between 10 and 55 years' imprisonment. The agreement also included a broad appeal waiver. Under its terms, Mr. Elliott could not appeal his convictions on any ground and could not appeal his sentence unless it exceeded 55 years (660 months) of imprisonment. The court did not inform Mr. Elliott of the nature of the conflict alleged by Sample or specifically reference the right to conflict-free counsel at his change of plea hearings. In his plea colloquy, Mr. Elliott told the district court he was satisfied with Sample's representation.

The district court accepted Mr. Elliott's guilty plea and ultimately imposed a sentence of 520 months of imprisonment.

Mr. Elliott filed this appeal.

## II

## DISCUSSION

Mr. Elliott now contends that the district court violated his Sixth Amendment right to conflict-free counsel when it failed to inform him of Sample's conflict of interest. He argues that his guilty plea was not knowing and voluntary because he was represented by conflicted counsel.

### A.

Before turning to the merits of Mr. Elliott's Sixth Amendment challenge, we address the Government's submission that the appellate waiver within Mr. Elliott's plea agreement forecloses his appeal. An appellate waiver, like the one contained in Mr. Elliott's plea agreement, only forecloses appellate review "if (1) the appeal falls within the scope of the appellate waiver and (2) the waiver is valid." *United States v. Mboule*, 23 F.4th 753, 757 (7th Cir. 2022). To be valid, the waiver must be knowing and voluntary. *United States v.*

*Onamuti*, 983 F.3d 892, 894 (7th Cir. 2020). Mr. Elliott contends that his appellate waiver was not knowing and voluntary because he was represented by conflicted counsel in negotiating the plea agreement and the district court did not obtain an informed waiver of that counsel's alleged conflict of interest.

Mr. Elliott's appellate waiver is not an impediment to our reaching the merits of his Sixth Amendment challenge. The Government's position that the appellate waiver forecloses our review of his conflict-of-interest claim is irreconcilable with our requirements for valid conflict waivers and our approach to ineffective assistance of counsel claims.

The principles that guide our decision are well established. A defendant may waive his right to conflict-free counsel. However, such a waiver must be "made knowingly and intelligently … with sufficient awareness of the relevant circumstances and likely consequences." *United States v. Flores*, 5 F.3d 1070, 1078 (7th Cir. 1993). "[T]he defendant must have enough information about the conflict and its potential effects from which to make a rational choice 'with eyes open.'" *Gomez v. Ahitow*, 29 F.3d 1128, 1133–34 (7th Cir. 1994) (quoting *United States v. Beniach*, 825 F.2d 1207, 1210 (7th Cir. 1987)). If Mr. Elliott had made such an informed waiver of Sample's alleged conflict, the appellate waiver provision would foreclose this appeal. *See United States v. Buissereth*, 638 F.3d 114, 117 (2d Cir. 2011) (attorney's conflict of interest did not render appellate waiver provision unenforceable because defendant made an informed waiver of the conflict). But to enforce a conflict waiver, we must be satisfied that the defendant made an informed decision. *Flores*, 5 F.3d at 1078.

Here, the Government does not contend that Mr. Elliott knowingly waived Sample's potential conflict. (Such an

argument would clearly be futile because Mr. Elliott was not aware of the relevant circumstances: Sample's discovery of the Suboxone strips.) Instead, the Government submits that the appellate waiver in Mr. Elliott's plea agreement bars him from challenging the district court's failure to provide him with the very information we would require he possess for an informed conflict waiver. Although Mr. Elliott could not waive knowingly and intelligently Sample's alleged conflict, the Government maintains that he nevertheless waived his right to challenge this conflict, unknown to him, by broadly waiving all challenges to his conviction on the advice of Sample, his allegedly conflicted counsel. This argument, if successful, would circumvent our requirement that a defendant waiving his conflict of interest have sufficient awareness of the circumstances to make a rational choice. *See Gomez*, 29 F.3d at 1133.

The Government's attempt to enforce the appellate waiver also is in conflict with our well-established approach to ineffective assistance of counsel claims. We have "repeatedly recognized that appellate … waivers cannot be invoked against claims that counsel was ineffective in the negotiation of the plea agreement." *Hurlow v. United States*, 726 F.3d 958, 964 (7th Cir. 2013). "Justice dictates that a claim of ineffective assistance of counsel in connection with the negotiation of a cooperation agreement cannot be barred by the agreement itself—the very product of the alleged ineffectiveness." *Jones v. United States*, 167 F.3d 1142, 1145 (7th Cir. 1999). Therefore, a waiver accepted in reliance on delinquent representation is not valid. *Id.*

Although Mr. Elliott does not raise an ineffective assistance of counsel claim, Mr. Elliott's appeal necessarily

implicates his Sixth Amendment right to effective assistance of counsel. "[T]he right to representation 'free from conflicts of interest'" is included within the Sixth Amendment's guarantee of effective assistance of counsel. *United States v. Coscia*, 4 F.4th 454, 475 (7th Cir. 2021) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). In unpublished opinions, the Courts of Appeals for the Sixth and Eleventh Circuits have both determined that appeals challenging the denial of a request for new counsel, without asserting ineffective assistance of counsel claims, still "necessarily implicate" the right to effective assistance of counsel and therefore fall within an ineffective assistance exemption from the appellate waiver. *United States v. Hudson*, No. 21-4126, 2023 WL 1463701, at *3 (6th Cir. Feb. 2, 2023) (unpublished); *United States v. Rogers*, 839 F. App'x 436, 438 (11th Cir. 2021) (unpublished).[12] Mr. Elliott's claim that the district court violated his right to conflict-free counsel by not informing him of Sample's conflict also falls within the ineffective assistance exemption.[13]

---

[12] Because these opinions were not published by the originating circuits, we do not regard them as authoritative. We can, and do, consider them, however, as considered analysis of the legal issues by a respected source.

[13] Relying on *United States v. Onamuti*, 983 F.3d 892 (7th Cir. 2020), the Government contends that the waiver should be enforced because Mr. Elliott's claim is based on an alleged error by the court. In *Onamuti*, the defendant appealed the district court's decision to deny him an evidentiary hearing on his request to withdraw his guilty plea because his attorney was ineffective. *Id.* at 894. Noting that the appeal was limited to the denial of the evidentiary hearing because the defendant was not raising an ineffective assistance of counsel claim, we held that the appeal was foreclosed by the appellate waiver in his plea agreement. *Id.* at 894–95. Critically, the defendant in *Onamuti* did not argue that the district court's error made his appellate waiver unknowing or involuntary. The district court's denial of
( … continued)

**B.**

To establish a violation of his Sixth Amendment right to conflict-free counsel under the standard articulated by the Supreme Court in *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), a defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."

"'An actual conflict exists if an attorney is torn between two different interests,' or 'required to make a choice advancing his own interests to the detriment of his client's interests.'" *United States v. Wright*, 85 F.4th 851, 859 (7th Cir. 2023) (internal citations omitted). Mr. Elliott offers two theories for how Sample's own interests conflicted with Mr. Elliott's. First, Mr. Elliott contends that Sample feared exposure of, or an investigation into, his or his fiancée's involvement in criminal activity and was thus motivated to hasten Mr. Elliott's case to a plea agreement. Second, Mr. Elliott suggests that Sample had an interest in avoiding the need to cross-examine Mr. Elliott's grandfather and mother at trial because they were paying Sample's fee and one may have been the person who gave Sample the documents concealing the controlled substances.

We need not resolve these issues because even if Sample was actually conflicted, Mr. Elliott suffered no adverse effect. To establish an adverse effect, Mr. Elliott must demonstrate "that 'but for the attorney's actual conflict of interest, there is a reasonable likelihood that counsel's performance somehow would have been different.'" *Coscia*, 4 F.4th at 475 (quoting

---

the evidentiary hearing came after he had agreed to the waiver. Here, by contrast, Mr. Elliott contends that the district court's failure to inform him of Sample's conflict itself rendered the plea agreement (and the waiver contained therein) invalid.

*Gonzales v. Mize*, 565 F.3d 373, 381 (7th Cir. 2009)). There must be "specific instances where [his] attorney could have, and would have, done something different." *Burkhart v. United States*, 27 F.4th 1289, 1295 (7th Cir. 2022) (quoting *United States v. Grayson Enters., Inc.*, 950 F.3d 386, 398 (7th Cir. 2020)). And these alternative actions must be plausible: "the law does not require defense counsel to pursue hypothetical strategies with no on-the-ground plausibility in the realities of the prosecution facing a defendant." *Id.* at 1296. If there was no plausible alternative to the path taken based on Sample's advice, then there is no reasonable likelihood that Sample's performance would have been different and Mr. Elliott cannot establish that he was adversely affected by Sample's alleged conflicts.

In determining whether the alleged conflicts affected Sample's advice, we consider the strength of the Government's case against Mr. Elliott. In *Burkhart*, for instance, we concluded that conflicted counsel's advice to plead guilty to his role in a fraudulent scheme to inflate invoices from vendors contracted to run nursing facilities was a "reasonable response" to the "overwhelming" evidence of the defendant's guilt. 27 F.4th at 1296. This overwhelming evidence included: secret recordings of the defendant discussing the scheme with vendors; emails between the defendant and his co-conspirators about the scheme; vendors' testimony about being asked to inflate invoices; financial records showing the flow of money from vendors to the defendant; and the agreements of three co-conspirators to testify as Government witnesses at the defendant's trial. *Id.* at 1296–97.

Here, the evidence against Mr. Elliott also was overwhelming. We note only the most salient aspects. The

Government had the recording of Mr. Elliott's call to "Arturo"; the handwritten letter identifying Minor Victim 1 and Witness Victim 1 as the recipients of the "motorcycle delivery"; the pornographic videos of Minor Victim 1 sent from Mr. Elliott's Facebook account; and the firearms seized from Mr. Elliott's home. Minor Victim 1, Witness Victim 1, Mr. Elliott's grandfather, Mr. Elliott's mother, the undercover FBI agent, and others had agreed to testify as Government witnesses. Mr. Elliott contends that we should place no stock in the weight of the Government's evidence because it was "never tested by a rigorous defense."[14] But he speaks only in generalities without identifying a plausible strategy that may have been employed to address any of this overwhelming evidence.

The plea negotiations conducted after the inception of Sample's alleged conflict clearly "yielded tangible benefits" for Mr. Elliott. *Burkhart*, 27 F.4th at 1297. These benefits are especially evident when we compare the August 2021 offer rejected by Mr. Elliott to the plea agreement he accepted in June 2022. The final plea agreement was, without doubt, more favorable to his interests. Under the 2021 offer, Mr. Elliott would have pleaded guilty to three additional counts and his minimum potential sentence would have been 15 years, instead of 10. Critically, these three additional counts were two counts of sexual exploitation of a minor and one count of enticement of a minor. By rejecting the 2021 offer and accepting the 2022 plea agreement, Mr. Elliott avoided being convicted of a sex offense.

---

[14] Appellant's Reply Br. 14.

Seeking to avoid *Sullivan*'s burden of establishing an adverse effect, Mr. Elliott contends that he is entitled to an automatic reversal of his convictions upon demonstrating an actual conflict of interest. But this is hardly one of those few cases where the Supreme Court has permitted us to conclude that impairment of the effective assistance of counsel violated such core principles of representation that reversal without a showing of prejudice is justified. In brief, we are not confronted with the joint representation of defendants over timely objection, *see Holloway v. Arkansas*, 435 U.S. 475 (1978), or with a situation where an attorney is required to represent a defendant on the morning of trial with no preparation or knowledge of the court's procedures, s*ee United States v. Cronic*, 466 U.S. 648, 660–61 (1984) (noting *Powell v. Alabama*, 287 U.S. 45 (1932)).

Without a showing of adverse effect, Mr. Elliott presents no ground for reversal.

### Conclusion

For the reasons stated, the district court's judgment is affirmed.

AFFIRMED